IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division



| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DALE BRITT BENDLER,<br><br>Defendant. | Case No. 1:25-cr-00109-RDA |

## STATEMENT OF FACTS

The United States and the defendant, DALE BRITT BENDLER (hereinafter, "defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

### Overview

1. Between in or about July 2017 and continuing through at least in or about July 2020, in the Eastern District of Virginia, and elsewhere, defendant, while being a public official, knowingly and unlawfully was and acted as an agent of a foreign principal required to register under the Foreign Agents Registration Act ("FARA"), that is, defendant agreed to and did act within the United States as an agent of Foreign Principals 1 and 2 by engaging in activities that required him to register under FARA, in violation of Title 18, United States Code, Section 219.

2. Between in or about July 2017 and continuing through at least in or about July 2020, in the Eastern District of Virginia, and elsewhere, defendant, being an officer, employee, contractor, or consultant of the United States, and, by virtue of such office, employment, position, and contract, became possessed of documents or materials containing classified information of the United States, as defined in 18 U.S.C. § 1924(c), up to the

SECRET//NOFORN level, and knowingly removed such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location, in violation of Title 18, United States Code, Section 1924.

Background

3. From at least July 2017 and continuing through at least in or about July 2020, in the Eastern District of Virginia and elsewhere, defendant, while employed as a full-time U.S. government contractor at the Central Intelligence Agency ("CIA"), surreptitiously worked for foreign principals to influence U.S. government perceptions and policies. During his work for these foreign principals, defendant engaged in lobbying and public relations activities in the United States and abroad and, on numerous occasions, disclosed and removed, without authorization, classified U.S. government information related to his foreign clients. At the same time defendant was working as a consultant for these foreign clients, he was a full-time contractor at the CIA with a Top Secret/Sensitive Compartmented Information ("TS/SCI") security clearance; employee-like access to CIA resources, information, and personnel; and multiple disclosure and outside-activity approval requirements. Defendant had access to classified U.S. government information because of his TS/SCI security clearance and his position as a full-time CIA contractor.

4. Defendant's relationship with the CIA dates back to the 1980s. From then until 2014, defendant was a CIA officer who served around the world in sensitive positions. As a CIA officer, defendant maintained a TS/SCI security clearance and received regular training on reporting activities outside of his CIA employment, unofficial contact with foreign nationals, and outside sources of income, as well as the proper handling and dissemination of classified information. He retired in 2014 as a member of the Senior Intelligence Service.

5.　Immediately after his retirement, defendant returned to the CIA as a full-time contractor. To maintain his TS/SCI security clearance, defendant continued to receive regular training about his reporting requirements and the proper handling of classified U.S. government information. During his tenure with the CIA—as an employee and as a contractor—defendant signed numerous non-disclosure and secrecy agreements. He also received regular training on ethics, reporting obligations, and information security. In September 2020, after learning of defendant's unauthorized work for foreign clients, the CIA terminated defendant's contract and revoked his security clearance and access to CIA facilities.

6.　Beginning in approximately July 2017 and ending in approximately September 2020, defendant worked as an outside consultant for a lobbying and communications firm based in Washington, D.C. (hereinafter, "U.S. Lobbying Firm"). From the beginning of his work for U.S. Lobbying Firm, all of defendant's work with U.S. Lobbying Firm was for specific clients, foreign and domestic, who hired U.S. Lobbying Firm to help resolve specific issues. These issues often involved the U.S. government or a foreign government. Typically, a foreign client would hire U.S. Lobbying Firm, and then U.S. Lobbying Firm would, in turn, hire defendant as a consultant. Defendant's compensation for each client he worked with varied, but his rate for some clients was as much as $20,000 per month. U.S. Lobbying Firm had previously filed numerous registration statements with the Foreign Agents Registration Act ("FARA") Unit in the National Security Division of the U.S. Department of Justice for work performed on behalf of foreign principals. It did not file registration statements for any of the foreign national clients discussed in this Statement of Facts. At no point did defendant or U.S. Lobbying Firm register under FARA for defendant's work on behalf of foreign principals. Instead, defendant concealed

the true nature of his work from his CIA colleagues, often misleading and manipulating them to further his foreign principals' interests, as described further below.

Foreign Principal 1

7. Beginning in approximately July 2017, while employed full-time as a CIA contractor, defendant began working for a foreign national ("Foreign Principal 1") based outside the United States. Foreign Principal 1 had previously managed the sovereign wealth fund of a foreign country ("Foreign Country 1"). At the time defendant began working for Foreign Principal 1, the government of Foreign Country 1 was investigating Foreign Principal 1 regarding allegations of embezzlement of Foreign Country 1's state funds. Foreign Principal 1 hired U.S. Lobbying Firm to respond to the embezzlement investigation by, among other things, mounting a public relations campaign to rebut the allegations and lobby U.S. government officials and officials of Foreign Country 1. U.S. Lobbying Firm, in turn, hired defendant to work as a consultant on the Foreign Principal 1 engagement. Defendant was familiar with governments on the same continent as Foreign Country 1 from his prior work at the CIA. Foreign Principal 1 agreed to hire and pay U.S. Lobbying Firm for its work, including the work of defendant, and U.S. Lobbying Firm agreed to pay defendant $20,000 per month as a consultant working on the engagement for Foreign Principal 1.

8. Almost immediately after learning of the opportunity to work for Foreign Principal 1, defendant began using his access as a CIA contractor to conduct unauthorized searches of classified U.S. government computer systems to see what information, if any, was available related to Foreign Principal 1. He also wrote and sent a paper to U.S. Lobbying Firm from his personal electronic device and email account that described options for various public perception and lobbying activities directed at U.S. government officials, officials of Foreign

4

Country 1, and public audiences that defendant was willing to engage in on behalf of Foreign Principal 1. For example, defendant offered to write an op-ed and post messages to social media about Foreign Principal 1 to influence the American public (Defendant ultimately edited, but did not sign, an op-ed that U.S. Lobbying Firm drafted on behalf of Foreign Principal 1 to influence the American public). Defendant also offered to use his personal relationships from his prior work in the U.S. intelligence community to influence U.S. government officials on the National Security Council and in the Office of the Director of National Intelligence. Moreover, the paper included classified U.S. government information, classified up to the SECRET//NOFORN level, that defendant was not authorized to disclose to U.S. Lobbying Firm or Foreign Principal 1. Neither defendant's personal electronic device nor his personal email account was authorized to store or transmit classified information.

9. During his work for Foreign Principal 1, in or about March 2018, defendant traveled to Foreign Country 1 to meet with Foreign Country 1 government officials and U.S. government officials. During this trip, defendant met with U.S. government officials to advocate on behalf of Foreign Principal 1. Defendant also made multiple attempts—directly and indirectly—to use his U.S. government relationships to gain access to multiple Foreign Country 1 officials who he believed could influence the Foreign Country 1 government's investigation of Foreign Principal 1.

10. Foreign Principal 1 directed many of defendant's activities and told him where to focus his efforts. For example, on or about April 13, 2018, Foreign Principal 1 told defendant that he needed to engage with a foreign government official and told him to, "[t]ry to understand him via some intel first" before contacting him. A few days later, defendant told Foreign Principal 1 that he had contacted the foreign government official. Foreign Principal 1 paid for

defendant's trip to Foreign Country 1 by making payments through U.S. Lobbying Firm. Defendant also submitted his expenses to U.S. Lobbying Firm for reimbursement. Between on or about April 25, 2018 and June 1, 2018, U.S. Lobbying Firm paid defendant approximately $80,000 for his work for Foreign Principal 1.

11. During his work for Foreign Principal 1, defendant also leveraged his past senior U.S. government positions and contractor position within the CIA to influence other U.S. government officials, within the United States, to broker an introduction between the government of Foreign Country 1 and defendant. At no point did defendant tell his CIA colleagues that Foreign Principal 1 had hired U.S. Lobbying Firm, who then hired defendant to influence Foreign Country 1's embezzlement investigation through U.S. and Foreign Country 1 government officials or that he was being paid $20,000 per month. In total, defendant was paid approximately $195,000 for his work on behalf of Foreign Principal 1.

12. At no point did defendant disclose the true nature of his work for Foreign Principal 1 to the CIA or obtain approval from the CIA to work for Foreign Principal 1. Neither defendant nor U.S. Lobbying Firm registered with the FARA Unit for defendant's work on behalf of Foreign Principal 1. Defendant failed to register with the FARA Unit for his work on behalf of Foreign Principal 1 because he believed that if the true nature of his work were known, the effectiveness of his lobbying and public relations activities would be reduced and his contract with U.S. Lobbying Firm and Foreign Principal 1 might end.

### Foreign Principal 2

13. Beginning in approximately January 2018, while employed full-time as a CIA contractor, defendant began working for another foreign national ("Foreign Principal 2") based in Foreign Country 2. Foreign Principal 2 was concerned about allegations that he was involved

in laundering money for a foreign terrorist organization. Foreign Principal 2 believed these allegations prevented him from receiving a U.S. visa. To improve his chances of obtaining a U.S. visa, Foreign Principal 2 hired U.S. Lobbying Firm to investigate the origin of the terrorism financing allegations, rebut them, repair any reputational damage caused by the allegations, and thereby assist him in obtaining a U.S. visa. U.S. Lobbying Firm, in turn, hired defendant as a consultant to work on behalf of Foreign Principal 2.

14. As part of his work for Foreign Principal 2, defendant abused his access as a CIA contractor to search classified U.S. government databases to see what, if any, information was available related to Foreign Principal 2. Defendant also tried to influence officials in the U.S. government to establish a relationship with Foreign Principal 2 with the aim that such a relationship could ultimately lead to Foreign Principal 2 obtaining a U.S. visa. Using his past senior positions in the U.S. government and role as a CIA contractor, defendant attempted to influence U.S. government officials' perceptions of Foreign Principal 2 and, at the same time and unbeknown to the U.S. government officials, coached Foreign Principal 2 on how he should interact with U.S. government officials. With the assistance of an employee of U.S. Lobbying Firm, defendant also provided Foreign Principal 2 with talking points on how he should respond to U.S. government officials' questions.

15. Defendant provided Foreign Principal 2 with regular updates through the U.S. Lobbying Firm employee. For example, on or about March 19, 2018, the same employee of U.S. Lobbying Firm described above asked defendant if he could "nudge" his contacts in the U.S. government about Foreign Principal 2. Defendant responded that he "gave the system another nudge" and that he was "birddogging the issue." Ten days later, on or about March 29, 2018, U.S. Lobbying Firm paid defendant approximately $6,000 for his work for Foreign Principal 2.

16. A few months later, on or about July 9, 2018, Foreign Principal 2 asked an employee of U.S. Lobbying Firm why no progress had been made on his U.S. visa issue. In response, the U.S. Lobbying Firm employee told Foreign Principal 2 that he "had several conversations with [defendant] regarding the current situation. He wanted me to tell you that he is just as frustrated as you are, and that he is checking on this every day." He also told Foreign Principal 2 that he and defendant "continue to push on your matter" and that some recent changes in the U.S. government's personnel in Foreign Country 2 would help their efforts to advance Foreign Principal 2's objectives.

17. Defendant also shared non-public and sensitive U.S. government information with U.S. Lobbying Firm and Foreign Principal 2 in the course of his work for Foreign Principal 2. At no point did defendant tell his CIA colleagues that Foreign Principal 2 had hired him to resolve the terrorism financing allegations against Foreign Principal 2 and obtain a U.S. visa for him. Nor did he tell his colleagues that he was being paid for his work on behalf of Foreign Principal 2. In total, defendant was paid approximately $10,000 for his work on behalf of Foreign Principal 2.

18. At no point did defendant disclose the true nature of his work for Foreign Principal 2 to or obtain approval from the CIA to work for Foreign Principal 2. Neither defendant nor U.S. Lobbying Firm registered with the FARA Unit for defendant's work on behalf of Foreign Principal 2. Defendant believed that if the true nature of his work for Foreign Principal 2 were known, the effectiveness of his lobbying and public relations activities would be reduced and his contract with U.S. Lobbying Firm and Foreign Principal 2 might end.

19. Defendant, as a full-time CIA contractor, was required to obtain pre-approval for any outside work before he began that work. Defendant never received approval for his outside

work, but instead submitted a false outside activity report to the CIA that claimed that he was working for U.S. Lobbying Firm on general issues, such as culture and politics, relating to Foreign Country 1. Defendant never disclosed that he was, in fact, working for Foreign Principal 1. Defendant also never disclosed to the CIA that he had agreed to work for other outside clients, including Foreign Principal 2, and that he had regularly communicated and met with many of his foreign outside clients while working as a full-time CIA contractor. Moreover, Defendant concealed from the CIA the true sources of the hundreds of thousands of dollars that he received from his foreign outside clients by insisting that any payment for his work on behalf of these clients be routed through U.S. Lobbying Firm instead of coming directly from any of his foreign clients.

<u>Other Instances of Defendant's Unauthorized Removal and Retention<br>of Classified Documents or Materials</u>

20. Between approximately July 2017 and September 2020, while a full-time CIA contractor, defendant worked for many other private clients, including many foreign nationals. At no time did defendant accurately disclose this work to the CIA and obtain pre-approval, as required under applicable law, applicable regulations, and his CIA contract. On some occasions, defendant abused his access to classified U.S. government computer systems and searched for information related to his private clients to determine whether classified information about those clients might exist in government holdings and what such information might be, even though he did not have a need to know such information and such information was unrelated to his duties as a CIA contractor.

21. In a handful of incidents, defendant also removed classified information from the CIA, placed that information on his own personal electronic devices, and disclosed that information, classified up to the SECRET//NOFORN level, to individuals who were not

authorized to know such information, including individuals whom he was trying to convince to hire him as a consultant. For example, in or about October 2019, defendant sent an email that contained information classified at the SECRET//NOFORN level from his personal email account to an employee of U.S. Lobbying Firm. The email concerned a conflict in a foreign country where one of U.S. Lobbying Firm's foreign clients was operating. That foreign client had previously hired defendant as a consultant and paid him tens of thousands of dollars through U.S. Lobbying Firm.

22. Defendant knowingly used non-public and sensitive U.S. government information, including classified information, for his own personal benefit and, in effect, the benefit of his private clients. Based on his years of training and experience in the U.S. Intelligence Community, defendant knew he should not have searched classified U.S. government databases for such information and that it was wrong to use his access to U.S. government resources and information to benefit himself and his private clients.

23. In total, between July 2017 (when defendant first began working with U.S. Lobbying Firm) and September 2020 (when the CIA terminated defendant's contract, access, and clearance after learning of his undisclosed outside work), defendant was paid approximately $360,000 for his undisclosed private client work.

24. The funds constituting the proceeds from defendant acting as a foreign agent while being a public official, in violation of 18 U.S.C. § 219, totaled at least $85,000.

25. This statement of facts includes those facts necessary to support the plea agreement between defendant and the United States. It does not include each and every fact known to defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding defendant's case.

26. The actions of defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

                                              Eric S. Siebert
                                              United States Attorney

By:      Gordon D. Kromberg
          Assistant United States Attorney

                                              Adam P. Barry
                                              Trial Attorney

                                              Heather M. Schmidt
                                              Senior Trial Attorney
                                              National Security Division
                                              U.S. Department of Justice

After consulting with my attorney and pursuant to the plea agreement entered into this day between me and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

                                              DALE BRITT BENDLER

I am Jesse R. Binnall, the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

                                              Jesse R. Binnall
                                              Attorney for DALE BRITT BENDLER