UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DALE BRITT BENDLER<br><br>Defendant. | Case No. 1:25-CR-00109-RDA |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Dale Britt Bendler, comes before this Court and appears for sentencing following his acceptance of responsibility upon entering a plea of guilty to one count of Unauthorized Removal and Retention of Classified Documents, in violation of 18 U.S.C § 1924, and to one count of Officers and Employees Acting as Agents of Foreign Principals.

Based upon his personal history and characteristics, the nature and circumstances of the offense, the absence of criminal history, the non-existent likelihood of recidivism, his total cooperation, and the need to avoid unwarranted sentencing disparities, Mr. Bendler respectfully requests that the Court impose a sentence of probation, as such a sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing. *See* 18 U.S.C. § 3553(a).

## LEGAL STANDARD

After *Gall v. United States*, the sentencing guidelines range is truly advisory. 552 U.S. 38 (2007). The Supreme Court stressed that "the Guidelines are only one of

1

the factors to consider when imposing sentence." *Id.* at 59. As the Court explained, the advisory guidelines sentencing range is only a "starting point and the initial benchmark" from which sentencing courts should begin to make their sentencing determinations. *Id.* at 49. That is because, pursuant to *United States v. Booker*, courts must consider the recommended guideline range as one factor in addition to those statutory sentencing factors enumerated in 18 U.S.C. §3553(a). *Booker*, 543 U.S. 220, 259-60 (2005).

Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. §3553(a). Upon consideration of those factors, a sentencing court may find that the case falls outside the "heartland" contemplated by the guidelines, or that "the guidelines sentence itself fails properly to reflect the §3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007). While the District Court must begin its analysis by correctly calculating the advisory sentencing range, the sentencing court is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence. The primary directive of §3553(a) is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

2

After *Booker* and *Gall*, therefore, sentencing courts must impose the sentence that is sufficient to accomplish the objectives of §3553(a). The sentencing court "may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. (internal citation omitted). In *Gall*, for example, the Supreme Court found that a sentence of probation was "reasonable" in a case in which the Guidelines called for a sentencing range of 30-37 months, and reversed the Court of Appeals for failing to "reflect the requisite deference" to the District Court's sentencing decision. *Id.* at 52–53. *See also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.").

In this case, Mr. Bendler argues that there are no analogous provisions in the Sentencing Guidelines for 18 U.S.C. § 1924. Instead, Mr. Bendler argues that the § 3553(a) factors are entirely controlling to § 1924 convictions. To the extent the Court agrees that § 1924 falls within U.S.S.G. § 2M3.3, however, Mr. Bendler respectfully requests a downward departure from the sentencing guidelines based on the same § 3553(a) factors.

APPLICATION OF THE § 3553(a) FACTORS

1. <u>The Nature and Circumstances of the Offense</u>

On April 23, 2025, Mr. Bendler pled guilty to 18 U.S.C. § 219 and 18 U.S.C. § 1924. These counts are described in the PSR. First, Mr. Bendler agreed to, and did, act within the United States as an agent of Foreign Principals 1 and 2 by engaging

in activities that required him to register under FARA, in violation of § 219. Second, Mr. Bendler removed classified materials without authority and with the intent to retain such materials at an unauthorized location, in violation of § 1924.

Mr. Bendler has cooperated with the government. He attended three eight-hour proffer sessions, providing information on his activities in this case, and spent roughly $200,000 on legal fees and travelling expenses to do so. When Mr. Bendler first met with the government, he even waived his right to an attorney and willingly submitted to a polygraph. Indeed, the PSR recognizes Mr. Bendler's cooperation. PSR ¶ 45. Mr. Bendler accepted responsibility for his conduct. Mr. Bendler pled guilty to the charged offenses and accepted responsibility early in the process, before the government had even obtained an indictment. Mr. Bendler has also paid back to the government a substantial portion of the profit he made over the course of his private-sector work. Mr. Bendler has fully complied with the probation office, and no problems have occurred.

Without diminishing Mr. Bendler's conduct, it is critical to consider that this conduct is not akin to any espionage-related activity. The Espionage Act, 18 U.S.C. §§ 793–798, criminalizes willful transmission, communication, or receipt of national defense information, often requiring proof that the defendant had reason to believe disclosure could injure the United States or aid a foreign nation. Unlike those statutes, § 1924 deals strictly with the unauthorized removal and retention of classified material from a secured environment. It is a mishandling statute, not an espionage statute. Mr. Bendler was not always certain as to the classified nature of

the information in question, and the information Mr. Bendler mishandled did not directly relate to either Foreign Principal 1 or Foreign Principal 2.

Indeed, the offenses committed by Mr. Bendler deal with just that, the mishandling of classified information, as further described in the classified supplement. Insofar as § 219 is concerned, Mr. Bendler believed that his employer, a major lobbying and communications firm in Washington, D.C., had completed the required paperwork for Mr. Bendler under FARA. While Mr. Bendler now understands that this was not the case, and that he is responsible for his failure to register, he respectfully asks the Court to consider the relevant circumstances which mitigate this violation. Indeed, although Mr. Bendler admits that he failed to register under FARA, at no time did Mr. Bendler conceal his involvement with the private sector. In fact, on or about February of 2017, and prior to beginning work as a private sector consultant, Mr. Bendler filed a formal outside activities request with the Office of Security, which informed the CIA that he sought to engage in private sector consulting, and identified the name of the firm he was working for. This request was approved.

Mr. Bendler also disclosed to CIA's Office of General Counsel that he was engaging in private sector work and inquired whether it was permissible for him to refer foreign nationals as candidates for "operationalization" as potential intelligence assets. Furthermore, Mr. Bendler disclosed that he was employed by this private-sector firm on his IRS Form 1099 and Form 1040. In addition to Mr. Bendler identifying his work in the private sector, Mr. Bendler identified Foreign Principal 1

in an additional outside activities request, as further described in the classified supplement. Mr. Bendler also informed the CIA that he encountered Foreign Principal 2 in the course of performing private sector work, as further described in the classified supplement.

Mr. Bendler also vehemently contests the government's accusation that he placed "cash before country" (Doc 25 at 1) and at no point in time did Mr. Bendler jeopardize the security of this nation. That Mr. Bendler spent 41-years of his life serving his country, in many instances at direct risk to his own life, is a testament to his dedication to this nation. Mr. Bendler never received any direct compensation for his private sector work from any foreign principal and was only ever paid by his firm. Mr. Bendler's case thus stands in stark contrast to the circumstances of U.S. Senator Robert Menendez, who received a significant sentence for his corrupt practices and receipt of direct payouts from foreign nationals, including "cash, gold bars, and other things of value." (Doc 25 at 13).

Finally, neither § 219 nor § 1924 requires imprisonment. "Congress thus not only envisioned, but accepted, the possibility that some defendants found guilty of that subsection of the statute would receive no jail time at all." *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007). And although offenses under § 1924 have been elevated from a misdemeanor to a felony offense, it is untrue that this necessarily implies all offenses under § 1924 require an active sentence. Indeed, a felony conviction alone is a significant deterrence to others and will profoundly impact Mr. Bendler's life in ways a misdemeanor conviction would not. To wit, Mr. Bendler

will never be able to participate in any federal election, he will never be able to obtain a security clearance to continue doing the sort of work he lived for and cherished, and he will be prohibited from practicing his Second Amendment rights. As a man who dedicated 41-years of service to his country, each of these penalties carries profound effects. For all these reasons, Mr. Bendler respectfully requests a probationary sentence.

2. The History and Characteristics of Mr. Bendler

The PSR captures Mr. Bendler's background and service to the United States well. Immediately following high school graduation, Mr. Bendler served in the United States Marine Corps from June 16, 1975 until June 15, 1979 and received an honorable discharge. PSR ¶ 85. Mr. Bendler completed non-commissioned officer school, an airborne course, ranger school, the DOD innovative course on explosives, S.W.A.T., sensor employment/implant course, and received a rifle expert badge, meritorious mast, and good conduct medal *Id.*

Thereafter, Mr. Bendler attended Rutgers University on the G.I. Bill, obtaining a Bachelor of Arts degree in History/Latin American studies in 1983. PSR ¶ 75. While at Rutgers, Mr. Bendler served one weekend per month for the United States National Guard. *Id.* at ¶ 82. From 1983 until 2014, Mr. Bendler worked as a CIA officer in senior intelligence service. *Id.* at ¶ 81. Mr. Bendler was selected into the Agency's elite Special Activities Division. In 1985, Mr. Bendler deployed to the civil war in El Salvador, where he served 18 months. Next, Mr. Bendler deployed to the civil war in Angola for one year. Then, Mr. Bendler was assigned to Peru, where

he stayed for two years, playing a lead role in the 1992 capture of the Shining Path leader. Mr. Bendler then returned to the Angola civil war for two more years.

Mr. Bendler attended the Naval War College, received various promotions and senior assignments at CIA Headquarters and overseas, and was Chief of Station three times. Mr. Bendler is a recipient of the Distinguished Career Intelligence Medal, Medal of Merit, GW Bush Award for Excellence in Counterterrorism, and the Knowlton Medal for support to Military Intelligence. Mr. Bendler was present at the World Trade Center on September 11, 2001, and has been diagnosed with chronic PTSD brought on by his years of service. Mr. Bendler is actively undergoing treatment for his PTSD with the Veteran's Administration. On balance, it is respectfully requested that this Court consider the precedent that, "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as [Mr. Bendler] did." *Porter v. McCollum*, 558 U.S. 30, 43 (2009).

Mr. Bendler's service and dedication to this country is well known among his peers and he is highly respected by those with whom he served. (Exhibits 1, 2 and 3). In addition to his career of service on behalf of the United States, Mr. Bendler has been married to Sandra Bendler for 30 years. (Exhibit 4) Mr. Bendler and his wife have three children, ages 27, 24, and 21. One of Mr. Bendler's children is still in college and relies on Mr. Bendler to pay for his education. Mr. Bendler has precious years left with his family and has missed many moments with his wife and children while serving his country.

Furthermore, as observed by Justice Stevens, matters such as age and other individual characteristics not considered by the Sentencing Commission are matters that Section 3553(a) "authorizes the sentencing judge to consider." *Rita*, 551 U.S. at 364-65 (Stevens, J., concurring). Mr. Bendler is 69 years old. Any term of imprisonment could literally be tantamount to a life sentence for Mr. Bendler. With great respect, Mr. Bendler asks the Court to consider his age, along with his service to this Nation, when imposing a sentence.

    3.  <u>The Need for the Sentence Imposed and Kinds of Sentences Available</u>

As former President Bush recognized when he commuted Lewis Libby's perjury and obstruction sentence (from 30 months to probation), "the consequences of his felony conviction . . . will be long-lasting" and "harsh."[1] Destruction of "professional capacity" and "ordinary livelihood," is "a pretty serious punishment already inflicted and carried out . . . and one that's likely to be permanent." *United States v. Whitmore*, 35 Fed. Appx. 307, 322 (9th Cir. 2002). The destruction of one's business and livelihood "constitutes a source of both individual and general deterrence." *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993). The Fourth Circuit has expressly approved of mitigated sentences when such collateral consequences have already been inflicted. *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007).

---

[1] *See* White House Office of the Press Secretary, *Statement by the President on Executive Clemency for Lewis Libby*, (Jul. 2, 2007) http://georgewbush-whitehouse.archives.gov/news/releases/2007/07/200707023.html/.

"If the circumstances of the case reveal that the purposes of sentencing have been fully or partially fulfilled *prior* to the imposition of sentence, a sentence within the range set forth by the guidelines may be 'greater than necessary' to satisfy those purposes." *United States v. Redemann*, 295 F. Supp. 2d 887, 895-96 (E.D. Wis. 2003) (emphasis in original). Likewise, collateral consequences add significantly to Mr. Bendler's punishment and act as an example to deter others from similar misconduct.

Mr. Bendler lost his security clearance in 2020, preventing him from performing his beloved job of teaching soldiers, sailors, and Marines. Mr. Bendler has also lost his passport, preventing him from working as an international consultant. Mr. Bendler was forced to sell his family home in McLean, Virginia, where he raised his three children, in part to cover legal expenses. Mr. Bendler has lost hundreds of friends and colleagues. Mr. Bendler started two cyber and urban safety companies in Miami; however, both collapsed due to the negative publicity of Mr. Bendler's conviction. Mr. Bendler co-authored a book with Agency friends; however, he was kicked out of the deal. Despite his decades of service to this Nation, social media has accused Mr. Bendler of being a spy and a traitor. Mr. Bendler has lost access to five different bank accounts, causing turbulence in his family finances. And Mr. Bendler has lost his Second Amendment rights and his right to vote. Putting one's life back together is never easy; this is especially true for Mr. Bendler as he approaches 70 years of age. Thus, probation is no greater than necessary to complete Mr. Bendler's punishment, while also making a proper example of him by virtue of the foregoing.

Furthermore, Mr. Bendler poses an extremely low risk to re-offend. As the PSR illustrates, Mr. Bendler has absolutely *zero* prior criminal history. PSR at ¶¶ 58–63. In 2004, the Sentencing Commission noted that "first offenders are less culpable and less likely to re-offend."[2] This is especially true here, where Mr. Bendler will likely never receive a reinstated security clearance.

The Sentencing Commission has also recognized other personal characteristics lowering recidivism rates, such as: (1) age; (2) marital status; (3) level of education; (4) a lack of substance abuse; and (5) a history of stable employment.[3] In this instance, Mr. Bendler is 69 years old, has been married for 30 years, has a bachelor's and master's degree, has no history of substance abuse, and was regularly employed since high school. Collectively, these substantially reduce any risk of recidivism.

Considering the above, and in light of neither § 219 nor § 1924 requiring imprisonment, probation is an appropriate sentence pursuant to 18 U.S.C. § 3561. Also available in lieu of imprisonment is supervised release and community service.

---

[2] United States Sentencing Commission, *Recidivism and the First Offender*, at 1 (May 2, 2004),
http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_First_Offender. pdf.
[3] United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at pages 11–15 ( May 1, 2004),
http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal_Histo ry.pdf.

4. <u>The Sentencing Guidelines Range</u>

The PSR concludes that the base offense level is at 24, falling within U.S.S.G. § 2M3.3. PSR at ¶ 48. The Guideline range the PSR thus suggests is 37 to 46 months. This calculation is incorrect.

Per Appendix A to the U.S.S.G., 18 U.S.C. § 1924 is not identified as an offense included under U.S.S.G. §2M3.3, or any other guideline. It is clear that § 1924 does not fit within § 2M3.3, nor would Mr. Bendler's conduct fit within this section. Section 3 of Part 2M specifically deals with "espionage and related offenses." It is also clear from the title of Part M that violations of 18 U.S.C. § 1924 are not the sort of offenses contemplated by Part M, as that part concerns "offenses involving the national defense and weapons of mass destruction." There is no allegation, nor indeed any fact presented in the PSR, or elsewhere, to suggest that Mr. Bendler committed an offense implicating the national defense. Similarly, the PSR has presented no fact that suggests that Mr. Bendler engaged in espionage.

According to the background section of § 2M3.3:

> The statutes covered in this section proscribe willfully transmitting or communicating to a person not entitled to receive it a document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense. Proof that the item was communicated with reason to believe that it could be used to the injury of the United States or the advantage of a foreign nation is required only where intangible information is communicated under 18 U.S.C. § 793(d) or (e).
>
> This section also covers statutes that proscribe the disclosure of classified information concerning cryptographic or communication intelligence to the detriment of the United States or for the benefit of a foreign government, the unauthorized disclosure to a foreign government or a communist organization of classified information by a

12

government employee, and the unauthorized receipt of classified information.

§ 1924 plainly does not fit within this description. § 1924, the offense that Mr. Bendler pled guilty to, penalizes persons who already had lawful access by virtue of their position, who knowingly remove, without authority, materials containing classified information with intent to retain those materials in an unauthorized location. This offense does not include willfully transmitting or communicating classified information.

The only colorable argument that § 1924 fits within § 2M3.3 is the portion that notes it covers "the unauthorized receipt of classified information." This too fails, however, because Mr. Bendler *was* authorized to receive classified information. The statute, instead, penalizes unauthorized *removal*. § 1924 is not a receipt statute; it is a mishandling statute. And while the PSR discusses instances of Mr. Bendler disclosing classified information to unauthorized individuals, Mr. Bendler has not been charged with, nor has he pled guilty to, any statute penalizing such activity.

Of the statutes § 2M3.3 cites, 18 U.S.C. §§ 793(d), (e), (g), 798; and 50 U.S.C. § 783, each contains a more significant penalty of imprisonment of ten years compared to the five years contained in § 1924. If Congress intended for § 1924 to be considered with the statutes in § 2M3.3, it would have created a harsher punishment commensurate with those statutes explicitly referenced within § 2M3.3. In accordance with USSG §2X5.1, when there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control sentencing. And for the reasons

13

discussed herein, Mr. Bendler respectfully requests the Court to find that these factors warrant probation, not imprisonment.

This analysis is not unique. In a 2025 Washington University Law Review article, one legal scholar acknowledged, after reviewing cases under seal and publicly where available, that § 1924 is one of the most common statutes in which a "judge determined that no analogous guideline covered the offense." Sam J. Merchant, *A World Without Sentencing Guidelines*, 102 Wash. U. L. Rev. 1031, 1051–53 (2025). This fact alone counsels against the use of §2M3.3 in order to achieve the sort of consistency in sentencing as mandated by §2X5.1 and 18 U.S.C. § 3553(6). In a recent instance within this district, the probation office determined that there was no analogous guideline for section § 1924, which no party objected to. *See United States v. Gun*, Case No. 1:24-cr-00199 (E.D. Va.).

To the extent the Court overrules Mr. Bendler's objection, however, Mr. Bendler asks for a downward departure from the sentencing recommendations for the reasons stated herein.

5. Avoidance of Unwarranted Sentencing Disparities

Mr. Bendler recognizes that the Court can impose a punishment of imprisonment. In cases where courts have imposed imprisonment, however, including within this district, Mr. Bendler's case is distinguishable when analyzing the § 3553(a) factors.

For example, in *Gun*, 1:24-cr-00199 (E.D. Va.), while the defendant was sentenced to 18 months' imprisonment for a violation of 18 U.S.C. § 1924, the

14

documents at issue were TOP SECRET. *Gun*, 1:24-cr-00199, Dkt. No. 26 at 4 (E.D. Va. Sept. 5, 2024). Emphasizing the serious nature of the defendant's conduct, particularly the emphasis on TOP SECRET documents, the United States even moved to revoke the defendant's release order. *Gun*, 1:24-cr-00199, Dkt. No. 19 (E.D. Va. Aug. 19, 2024). Furthermore, the defendant was 52 years old and does not appear to have engaged in any service to the United States during his lifetime. And the defendant tried to take a TOP SECRET printed document into Mexico. *Gun*, 1:24-cr-00199, Dkt. No. 60 at 3 (E.D. Va. Jun. 9, 2025). By contrast, in this case, Mr. Bendler did not print out any documents or materials, and the materials at issue only rose to the level of SECRET//NOFORN. Furthermore, unlike the defendant in *Gun*, Mr. Bendler is nearing 70 years of age, immediately took responsibility for his actions–the defendant in *Gun* did not plead guilty until 7 months after the filing of the complaint–and Mr. Bendler served this Nation valiantly for many decades since graduating high school.

In another case of *United States v. Kemp*, 3:21-cr-00009 (S.D. Ohio), the defendant was sentenced to imprisonment of 12 months and one day for violating 18 U.S.C. § 1924. In *Kemp*, the defendant printed out 2,500 pages of documents marked at the SECRET level. *United States v. Kemp*, 3:21-cr-00009, Dkt. No. 11 at 2 (S.D. Ohio May 18, 2021). The defendant stored these documents in his home, where he also operated a significant marijuana growing operation. *Id.* at 3. This created heightened risks of robbery and other criminal activity, compounding the risk of the documents falling into the wrong hands. *Id.* The defendant was 36 years old and does

not appear to have had any military service.[4] Again, by contrast, Mr. Bendler's case deals with considerably less pages of materials, and he neither printed out any documents, nor did he store any documents or materials at the location of an illicit drug operation. And, at nearly 70 years old and having provided decades of service to this Nation, Mr. Bendler's characteristics are starkly distinguishable. Additionally, these cases illustrate that the 37 to 46 months of imprisonment suggested by the PSR would result in an extreme sentencing disparity.

Finally, while the government contends that a significant jail sentence is warranted to serve as an example to others who would mishandle classified information, Mr. Bendler respectfully argues that this sort of example sends exactly the wrong message. Specifically, the government has routinely declined to seek an active jail sentence for violations of § 1924 in several high-profile cases, including in the cases of General David H. Petraeus and U.S. National Security Advisor Samuel "Sandy" Berger, both of whom received fines and probationary sentences. Thus, the message being sent is clear, those at the top will be handled gently, while those at the bottom will be destroyed.

---

[4] United States Attorney's Office Southern District of Ohio, *Press Release: Former Air Force contractor sentenced to prison for illegally taking 2,500 pages of classified information*, (Sept. 21, 2021), https://www.justice.gov/usao-sdoh/pr/former-air-force-contractor-sentenced-prison-illegally-taking-2500-pages-classified?utm_source=chatgpt.com.

    6. The Need for Restitution

As illustrated in the PSR, "[t]here are no identifiable victims in this offense." PSR ¶ 42. Furthermore, Mr. Bendler has already remitted to the United States $85,000.00 in satisfaction of the forfeiture money judgment. Mr. Bendler indicated his willingness to pay for his misconduct by bringing a check in this sum with him to his plea hearing. And Mr. Bendler has since made the requisite FARA filings.

## CONCLUSION

Mr. Bendler recognizes that respect for the law, just punishment, and deterrence demand supervision. However, too harsh a sentence fails to respect the law equally as too lenient a sentence, and it violates the statute requiring this sentence to be no greater than necessary. Given Mr. Bendler's characteristics and acceptance of responsibility, Mr. Bendler respectfully requests that the Court impose a sentence of probation for 2 years.

Dated: November 14, 2025                       Dale Britt Bendler
                                                           By Counsel

BINNALL LAW GROUP, PLLC

*/s/     Gerald A. Urbanek, Jr.*
Jesse R. Binnall, VSB No. 79292
Jared J. Roberts, VSB No. 97192
Gerald A. Urbanek, Jr. VSB No. 95043
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: jesse@binnall.com
           jared@binnall.com
           gerald@binnall.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

<u>/s/      Gerald A. Urbanek, Jr.</u>
Gerald A. Urbanek, Jr.
